Ronald E. TROYER, Employee,

v.

VERTLU MANAGEMENT COMPANY/KOK & LUNDBERG FUNERAL HOMES, and State Auto Insurance Company Relators,

and

HealthEast Care System, Respondent.

No. A10–1930.

Supreme Court of Minnesota.

Aug. 17, 2011.

Robin Simpson, Radd Kulseth, Aafedt, Forde, Gray, Monson & Hagar, P.A., Minneapolis, MN, for relators.

Todd J. Thun, Thun Law Office, P.A., Minneapolis, MN, for respondent.

Andrew W. Lynn, Lynn, Scharfenberg & Associates, Minneapolis, MN, for amicus curiae Insurance Federation of Minnesota.

Roderick C. Cosgriff, Heacox, Hartman, Koshmrl, Cosgriff & Johnson, P.A., St. Paul, MN, for amicus curiae Fairview Health Services.

## OPINION

ANDERSON, PAUL H., Justice.

Ronald Troyer suffered a work-related injury to his lower back while working for Vertlu Management Company and Kok & Lundberg Funeral Homes. Troyer underwent surgery at St. Joseph's Hospital, a facility owned by HealthEast Care System. Troyer's injury required surgical implantation of a spinal cord stimulator. Vertlu's workers' compensation insurance provider, State Auto Insurance Company, paid part but not all of the expenses associated with Troyer's surgery. State Auto asserted that the withheld portion of the expenses was attributable to a price mark-up added by HealthEast to the price paid by HealthEast for the implant hardware used in Troyer's surgery. State Auto further asserted that under Minn. R. 5221.0700, subp. 2A (2009), the manufacturer of the implant hardware should be required to charge directly for the implant hardware. The compensation judge assigned to hear State Auto's claim determined that HealthEast could charge directly for the implant hardware. The judge also concluded that a compensation judge does not have the authority to determine a reasonable price for the implant hardware below 85 percent of HealthEast's usual and customary price. The Workers' Compensation Court of Appeals affirmed, and Vertlu and State Auto petitioned for a writ of certiorari. We affirm.

The facts in this case are not in dispute. Ronald Troyer was an employee of relators Vertlu Management Company and Kok & Lundberg Funeral Homes. In the course of his employment, Troyer suffered an injury to his lower back. Vertlu was insured for workers' compensation liability in Minnesota by relator State Auto Insurance Company. Vertlu and State Auto admitted liability for Troyer's injury. Troyer was hospitalized at St. Joseph's Hospital, a facility owned by respondent HealthEast Care System. On August 27, 2008, Troyer underwent lower back surgery to relieve the effects of his injuries. This surgery included the implantation of an Implantable Pulse Generator (IPG) spinal cord stimulator implant system. The IPG system was manufactured by Advanced Neuromodulation Systems, Inc. (ANS) and consisted of four components. St. Joseph's does not usually keep these components in stock. In this case, St. Joseph's ordered the components at the direction of Troyer's physician specifically for use in Troyer's surgery. The components were delivered to St. Joseph's by ANS.

In surgeries such as Troyer's, it is common for ANS representatives to be present in the operating room during surgery to consult with the surgeon if necessary.[1] But the representatives do not enter the "sterile field": a ten-foot-radius sterile zone around the patient. Also, the actual surgery is done by the surgeon, and participation by the ANS representatives is limited to answering any questions that the surgeon might have.

HealthEast's usual and customary charge[2] for the ANS components totals

---

1. The parties did not offer evidence on what actually happened during this particular surgery, and only offered evidence on customary practice during surgeries of this type.

2. As defined in Minn. R. 5221.0500, subp.

$73,320. CorVel, a health care pricing consulting firm, requested the invoices for the ANS components from HealthEast on behalf of Vertlu and State Auto. But HealthEast refused to provide the invoices, asserting that the price paid by HealthEast was confidential and proprietary in nature. Upon the recommendation of CorVel, Vertlu and State Auto made full payment to HealthEast for all charges except the charges for the implant hardware used in Troyer's surgery. For the implant hardware, Vertlu and State Auto paid a total of $24,440.[3] HealthEast claims an unpaid balance of $37,822, which represents the difference between 85 percent of its usual and customary charge, and the price that Vertlu and State Auto actually paid to HealthEast.

On March 9, 2009, HealthEast filed a medical request with Vertlu and State Auto, asking that the balance of its bill be paid, along with penalties for late payment. Vertlu and State Auto responded on May 7, 2009, asserting that under Minn. R. 5221.0700, subp. 2A[4] (providing that

charges for services, articles, and supplies must be submitted to the payer by the "health care provider actually furnishing" the service, article, or supply), HealthEast was obliged to furnish the actual cost invoice of the implant components, or demonstrate that it kept the implant components in stock on a regular basis.[5]

The matter was heard before a compensation judge and the judge found that Vertlu and State Auto were liable for the unpaid balance. The judge rejected Vertlu and State Auto's arguments that ANS was the health care provider that actually furnished the surgical implants within the meaning of Minn. R. 5221.0700, subp. 2(A). The judge also rejected Vertlu and State Auto's argument that the judge had the authority to determine a reasonable value of the implant hardware that was lower than 85 percent of the usual and customary charge under Minn.Stat. § 176.136, subd. 1b(b) (2010).[6]

The Workers' Compensation Court of Appeals (WCCA) affirmed the compensation judge. *Troyer v. Vertlu Mgmt. Co.,*

2(B)(1) (2009), a "usual and customary charge" is "the amount actually billed by the health care provider to all payers for the same service, whether under workers' compensation or not, and regardless of the amount actually reimbursed under a contract or government payment system."

3. It appears that this figure was derived by CorVel from invoices for similar implants ordered by different health care providers.

4. Minn. R. 5221.0700, subp. 2A, provides:
Charges for services, articles, and supplies must be submitted to the payer directly by the health care provider actually furnishing the service, article, or supply. This includes but is not limited to the following:
. . . .
(2) equipment, supplies, and medication not ordinarily kept in stock by the hospital or other health care provider facility, purchased from a supplier for a specific employee;
. . . .

5. Under Minn. R. 5221.0700, subp. 2A(2), a hospital may charge directly for supplies that it regularly keeps in stock.

6. Minn.Stat. § 176.136, subd. 1b(b), provides:
The liability of the employer for the treatment, articles, and supplies that are not limited by subdivision 1a or 1c or paragraph (a) shall be limited to 85 percent of the provider's usual and customary charge, or 85 percent of the prevailing charges for similar treatment, articles, and supplies furnished to an injured person when paid for by the injured person, whichever is lower. On this basis, the commissioner or compensation judge may determine the reasonable value of all treatment, services, and supplies, and the liability of the employer is limited to that amount.

2010 WL 4057563 (Minn. WCCA Oct. 4, 2010). First, the WCCA concluded that HealthEast, not ANS, was the health care provider of the implant hardware. *Id.* at *6. The WCCA therefore held that HealthEast was entitled to directly charge for the implant hardware. *Id.* at *7. Second, the WCCA affirmed the compensation judge's holding that the judge lacked authority to determine the reasonable value of the implant hardware at less than 85 percent of HealthEast's usual and customary charge. *Id.* at *9. Vertlu and State Auto petitioned our court for a writ of certiorari and raised two issues on appeal. First, was HealthEast entitled to directly charge for the implant hardware used in Troyer's surgery? Second, did the compensation judge have the authority to determine a reasonable price for the implant hardware below 85 percent of HealthEast's usual and customary price?

## I.

 The first issue before us is whether HealthEast was entitled to charge Vertlu and State Auto directly for Troyer's surgical implant hardware. This issue is primarily one of rule construction. Rule construction is a question of law. *St. Otto's Home v. Minn. Dep't of Human Services,* 437 N.W.2d 35, 39–40 (Minn. 1989). We review de novo questions of law determined by the WCCA. *Owens ex rel. Owens v. Water Gremlin Co.,* 605 N.W.2d 733, 735 (Minn.2000).

Billing for workers' compensation health care services is governed by Minn. R. 5221.0700, subp. 2A, which provides that "[c]harges for services, articles, and supplies must be submitted to the payer directly by the health care provider actually furnishing the service, article, or supply." Subpart 2A includes several specific situations in which health care providers must charge directly for services, articles, and supplies. One of these situations is found in subpart 2A(2), which specifies that subpart 2A includes "equipment, supplies, and medication not ordinarily kept in stock by the hospital or other health care provider facility, purchased from a supplier for a specific employee." Applying subpart 2A to this case requires us to examine (1) whether ANS is a health care provider and (2) whether HealthEast or ANS "actually furnish[ed]" the implant hardware.

*Health Care Provider*

Minnesota Rule 5221.0700, subp. 2A, by its terms, only applies to health care providers. It is undisputed that HealthEast is a health care provider. But the WCCA concluded that ANS is not a health care provider, and therefore could not be required to directly charge for the implant hardware. *Troyer,* 2010 WL 4057563, at *6. HealthEast argues that the WCCA correctly concluded that ANS is not a health care provider, and therefore does not fall under Minn. R. 5221.0700, subp. 2A. Both Vertlu and State Auto assert that the WCCA erred when it determined that ANS is not a health care provider.

A "health care provider" is defined in Minn.Stat. § 176.011, subd. 12a (2010), as "a physician, podiatrist, chiropractor, dentist, optometrist, osteopath, psychologist, psychiatric social worker, or *any other person*[7] who furnishes a medical or health service to an employee under this chapter...." (Emphasis and footnote added.) A "service" is further defined in Minn. R. 5221.0100, subp. 15 (2009), as "any ... supply, product, or other thing ... provided for the purpose of curing or relieving an injured worker from the effects of a compensable injury under Minnesota Statutes,

---

7. The term "person" may also refer to "bodies politic and corporate, and to partnerships and other unincorporated associations." *See* Minn.Stat. § 645.44, subd. 7 (2010).

section 176.135, subdivision 1." Taken together, these definitions establish that a health care provider may be "any other person" who furnishes "any ... thing ... provided for the purpose of curing or relieving an injured worker." Minn.Stat. § 176.011, subd. 12a; Minn. R. 5221.0100, subp. 15. It appears that ANS may fall under this definition. But because we ultimately conclude that ANS did not "actually furnish" the implant hardware in this case, we need not determine whether ANS is a health care provider. Therefore we will proceed with our analysis assuming without deciding that ANS falls under the statutory definition of "health care provider." Minn.Stat. § 176.011, subd. 12a.

*Actually Furnished*

■ Assuming that both ANS and HealthEast are health care providers, we must determine which entity "actually furnish[ed]" the implant hardware in question. We note first that neither party asserts that Troyer's physician, who is also a health care provider,[8] is the entity who "actually furnished" the implant hardware at issue. Moreover, it does not appear from the record that the physician ever purchased or owned the implant hardware. Accordingly, we do not consider whether the physician is entitled to charge for the implant hardware, and confine our inquiry to determining which entity, as between ANS and HealthEast, "actually furnished" the implant hardware.

■ Answering this question requires us to interpret the word "furnished" as it is used in Minn. R. 5221.0700, subp. 2A.

We have said that when interpreting a rule, we must first determine whether the rule "is clear or ambiguous on its face." *Indep. Sch. Dist. No. 12 v. Minn. Dep't of Education,* 788 N.W.2d 907, 912 (Minn. 2010) (citation omitted) (internal quotation marks omitted). We construe words and phrases "according to their common and approved usage." Minn.Stat. § 645.08 (2010). When considering the plain and ordinary meaning of words or phrases, we have consulted dictionary definitions. *State v. Hartmann,* 700 N.W.2d 449, 453–54 (Minn.2005). We also construe rules "as a whole" and "words and sentences are understood ... in the light of their context." *State v. Gaiovnik,* 794 N.W.2d 643, 647 (Minn.2011) (citation omitted) (internal quotation marks omitted). When possible, "no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Krueger v. Zeman Constr. Co.,* 781 N.W.2d 858, 861 (Minn.2010) (citations omitted) (internal quotation marks omitted).[9]

■ A rule is ambiguous if it is unclear or reasonably susceptible to more than one reasonable interpretation. *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738,* 763 N.W.2d 303, 310 (Minn.2009) (citation omitted) (internal quotation marks omitted). If the rule is unambiguous, we construe the rule according to the common and approved usage of its words and phrases and do not disregard the rule's plain meaning to pursue its spirit. *Id.* When the words of a rule are ambiguous, the intent of the rule makers may be as-

---

8. *See* Minn.Stat. § 176.011, subd. 12a (" 'Health Care Provider' means a physician...."); Minn.Stat. § 176.011, subd. 17 (2010) (" 'Physician' ... includes surgeon.").

9. *Krueger* refers to the construction of a statute, but we have similar guidelines when interpreting rules and statutes. *See Erdman v. Life Time Fitness, Inc.,* 788 N.W.2d 50, 56

(Minn.2010). Moreover, Minn.Stat. § 645.001 (2010) provides that the statutory interpretation provisions of Minn.Stat. ch. 645, "unless specifically provided to the contrary by law or rule, govern all rules becoming effective after June 30, 1981." Minnesota Rule 5221.0700 was adopted in 1992.

certained by considering canons of construction. *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs,* 713 N.W.2d 817, 828 (Minn.2006); *see also* Minn.Stat. § 645.16 (2010); Minn.Stat. § 645.17 (2010).

*Webster's* offers two definitions of "furnish": (1) "supply," or (2) "to provide with what is needed." *Merriam–Webster's Collegiate Dictionary* 473 (10th ed.1998). We examine these definitions in turn, considering first the broader definition ("supply") and second, the more restrictive definition ("to provide with what is needed"). Both of these definitions are reasonable in the context of the Minn. R. 5221.0700, subp. 2A. Therefore, the rule is ambiguous, and we apply canons of construction to determine the intent of the rule makers. *Alexandria Lake Area,* 763 N.W.2d at 310.

We begin by considering the broad definition of "furnish"—to "supply." *Merriam–Webster's Collegiate Dictionary* 473 (10th ed.1998). A service, article, or supply may potentially pass through the possession of several entities on its way from the manufacturer to the injured employee, and each entity which passes the service, article, or supply to another entity can be said to have, in some sense, "suppl[ied]" the service, article, or supply. Accordingly, under this broad interpretation, any entity that supplied the service, article, or supply at any point in its transmission to the employee has "furnish[ed]" the hardware.

■ We conclude that the Legislature cannot have intended such a broad definition of "furnish" in the context of Minn. R. 5221.0700, subp. 2A. More specifically, there could be multiple entities that transmit a service, article, or supply. All or some of these entities could fit within the statutory definition of "health care provider." If all of these entities have "furnish[ed]" the service, article, or supply, then all would, under the plain language of Minn. R. 5221.0700, subp. 2A, be entitled to charge for the service, article, or supply. Such a broad meaning would be inconsistent with the statutory directive specifying that "*the* health care provider actually furnishing the service, article, or supply" must charge for the service, article, or supply. Minn. R. 5221.0700, subp.2A (emphasis added).[10] The specific language of Minn. R. 5221.0700, subp. 2A, indicates that there is one health care provider who is to charge for the service, article, or supply. Because only one health care provider may charge for a service, article or supply, an interpretation of "furnish" that provides no basis to choose among several health care providers would be impossible to implement. We presume that the drafters of the rule did not intend such an interpretation. *See* Minn.Stat. § 645.17(1) (providing that courts may presume that the Legislature does not intend an impossible result).

Vertlu and State Auto argue that ANS is *the* health care provider that "actually furnish[ed]" the implant hardware to Troyer because ANS allegedly played a more significant role, or added more value in the creation and transmission of the hardware. Vertlu and State Auto argue that we should consider the implant hardware in isolation, and compare specifically what HealthEast and ANS did to add value to the implants for the employee. But even if we assume for the sake of the argument that we should consider the implant hardware in isolation, Vertlu and State Auto's argument is still flawed. Vertlu and State

---

10. *See Larson v. State,* 790 N.W.2d 700, 703 (Minn.2010) ("The word 'the' is a definitive and when used before a noun has a specifying and particularizing effect." (quoting *Lowry v. City of Mankato,* 231 Minn. 108, 115, 42 N.W.2d 553, 558 (1950))).

Auto provide no justification for why "adding value" should be the touchstone for our interpretation of the word "furnish."

Moreover, determining which entity added more value to the implant hardware in this case is a nebulous and subjective task requiring compensation judges to compare the incomparable. It is true, as Vertlu and State Auto assert, that the implant hardware would be useless to Troyer had it not been designed and manufactured. But the implant hardware would also be useless to Troyer had it not been selected, purchased, and surgically implanted by personnel at St. Joseph's. The implant hardware was therefore useless to Troyer without the services of either entity.

We conclude that simply comparing services provided by either entity, as Vertlu and State Auto propose, does not provide a meaningful way to delineate which entity added more value. Further, requiring compensation judges to determine which health care provider added more value to medical supplies and devices may well fall into the category of being an interpretation that is "absurd, impossible of execution, [and] unreasonable." Minn.Stat. § 645.17(1). Again, we presume the rule drafters did not intend such a result. Minn.Stat. § 645.17. Thus we reject Vertlu and State Auto's argument for adopting a broad interpretation of the term "furnish."

▉▉▉▉ Having concluded that "furnish" in the context of this rule does not simply mean merely supplying a service, article or supply, we proceed to consider the alternative interpretation. In doing so, we look at the narrower dictionary definition of "furnish,"—"to provide with what is needed." *Merriam–Webster's Collegiate Dictionary* 473 (10th ed.1998). Unlike the broader definition of the term "furnish," the definition "to provide with what is needed" takes into account the

purpose for which the service, article, or supply is provided and limits the reach of the term "furnish" to situations in which the service, article or supply furnished is necessary to fulfill a purpose. Here, the purpose for which services, articles, and supplies are provided is the treatment of injured employees. *See* Minn. R. 5221.0100, subp. 15 (defining "service" as "any ... other thing performed or provided *for the purpose of curing or relieving an injured worker* from the effects of a compensable injury ...." (emphasis added)). We conclude that a service, article, or supply is provided for the purpose of treating an injured employee when given to the employee in its final, usable form. Therefore, as applied to Minn. R. 5221.0700, subp. 2A, the term "furnish" appears to mean to provide to an employee in a final, usable form.

Applying this narrower interpretation is consistent with the presumption that the rule maker intends the entire rule to be "effective and certain." Minn.Stat. § 645.17(2). Only one entity can be said to have provided the service, article, or supply to the employee in its final, usable form. Therefore, our interpretation avoids the uncertainty inherent in Vertlu and State Auto's interpretation of Minn. R. 5221.0700, subp. 2A, and renders the rule's language certain by providing a simple test. *See* Minn.Stat. § 645.17.

This narrower interpretation is also consistent with the Minn. R. 5221.0700, subp. 2A, definition of "health care provider." We have said in the context of statutory interpretation that when language is ambiguous, we may look to other statutes upon the same or similar subjects. *In re Welfare of the Children of N.F. and S.F.*, 749 N.W.2d 802, 807 (Minn.2008); *Harris v. Cnty. of Hennepin*, 679 N.W.2d 728, 732 (Minn.2004); *see also State v. Lucas*, 589 N.W.2d 91, 94 (Minn.1999). Minnesota

Rule 5221.100, subd. 12, by incorporating the language of Minn.Stat. § 176.011, subp. 12a, provides that a health care provider is an entity that furnishes a medical or health service *to an employee.* Our definition of "furnish," which provides that the health care provider "actually furnishing" a service, article, or supply provides it "to an employee," is consistent with the definition of "health care provider."

*Alternative Arguments*

■ Vertlu and State Auto appear to argue in the alternative that the result in this case is controlled by the language of Minn. R. 5221.0700, subp. 2A(2), which provides that "[direct billing by health care providers includes, but is not limited to] equipment, supplies, and medication not ordinarily kept in stock by the hospital or other health care provider facility, purchased from a supplier for a specific employee." But the language of subpart 2A(2) establishes specific examples of situations covered by the broader rule set out in subpart 2A. These specific examples only apply if we first conclude that the supplier is the "health care provider actually furnishing" a service, article, or supply. Because we conclude that ANS is not the "health care provider actually furnishing" the service, article, or supply, the language of subpart 2A(2) does not apply to ANS.[11]

Vertlu and State Auto also make arguments based on policy and rule-making history. They rely in part on the "reasonable cost" language found in the legislative statement of policy in Minn.Stat. § 176.001 (2010): "It is the intent of the legislature

that chapter 176 be interpreted so as to assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost. . . ." But our court is not the best entity to determine which interpretation of "actually furnish" would best effectuate this legislative policy. Vertlu and State Auto assert that interpreting the rule in such a way as to require a supplier to charge directly for services, articles, and supplies promotes a policy that prevents markups, and therefore results in reasonable costs. But at oral argument, counsel for HealthEast suggested that adopting Vertlu and HealthEast's argument would simply force hospitals to keep expensive, delicate, custommade medical hardware in stock, simply to avail themselves of the protection of subpart 2A(2). Therefore, it is unclear which interpretation of the statute will best effectuate the legislative policy articulated in Minn.Stat. § 176.001.

Vertlu and State Auto also rely on the Department of Labor and Industry's Statement of Need and Reasonableness (SONAR), which discusses the rationale behind Minn. R. 5221.0700, subp. 2A. We may consider extrinsic sources to determine legislative intent when language is ambiguous. Minn.Stat. § 645.16. We have relied on SONARs as evidence of the extrinsic factors listed in Minn.Stat. § 645.16 in the past. *Citizens Advocating Responsible Dev.*, 713 N.W.2d at 830. Vertlu and State Auto point to language in the SONAR which explains that the rationale for Minn. R. 5221.0700, subp. 2A, is to avoid "[t]he problem of mark-ups for services

11. While we conclude that subpart 2A(2) does not control in this case, we note that our approach does not render subpart 2A(2) meaningless. When a supplier who is also a health care provider sends a product to a hospital in its final, usable form, the supplier will be required to submit charges directly to the payer under Minn. R. 5221.0700, subpart

2A, because the supplier is the entity that has provided the product in its final form directly to the employee. In this situation, the fact that the hospital orders the hardware on the employee's behalf and takes delivery of the hardware on the employee's behalf does not alter the statutory requirement that the supplier must charge for the product.

provided by another business entity but billed by the referring provider ... thus reducing costs and minimizing disputes." SONAR at 36. But HealthEast was not merely a "referring provider" in this case. Personnel at St. Joseph's Hospital ordered the implant hardware for use in Troyer's surgery at its facility. Therefore, the language cited by Vertlu and State Auto does not demonstrate that Minn. R. 5221.0700, subp. 2A, was intended to cover a situation such as the one before us.

■■■■ Here, we conclude that when more than one health care provider is responsible for the creation or transmission of a service, article, or supply, the health care provider that provides the service, article, or supply in its final, usable form to the injured employee has "actually furnish[ed]" the service, article, or supply, and is entitled to charge for that service, article, or supply under Minn. R. 5221.0700, subp. 2A. Applying this rule to the facts before us, it is evident from the record that ANS did not furnish anything to Troyer in a final, usable form. HealthEast purchased the implant hardware from ANS and then provided to Troyer both the implant hardware and the surgery necessary for Troyer to utilize the implant hardware. Therefore, we hold that the entity that "actually furnish[ed]" the implant hardware to Troyer is HealthEast, not ANS. As such, HealthEast is entitled to charge for the implant hardware.

## II.

■■■ The second issue before us is whether the compensation judge and the WCCA erred when they concluded that the compensation judge did not have the authority to determine a reasonable value for the implanted devices at an amount less than 85 percent of the hospital's usual and customary charge. HealthEast argues that the compensation judge and the WCCA correctly determined that a compensation judge's authority is limited to determining the lower of 85 percent of HealthEast's usual and customary charge, or the prevailing charge. Minn.Stat. § 176.136, subd. 1b(b), provides:

The liability of the employer for the treatment, articles, and supplies that are not limited by subdivision 1a or 1c or paragraph (a) shall be limited to 85 percent of the provider's usual and customary charge, or 85 percent of the prevailing charges for similar treatment, articles, and supplies furnished to an injured person when paid for by the injured person, whichever is lower. On this basis, the commissioner or compensation judge may determine the reasonable value of all treatment, services, and supplies, and the liability of the employer is limited to that amount.

Here, the compensation judge found that the term "on this basis" meant that the compensation judge's review of the reasonable value of treatment, services, and supplies was limited to determining the lower of 85 percent of HealthEast's usual and customary charge, or the prevailing charge. The WCCA agreed. *See Troyer,* 2010 WL 40576563, at *9.

■■■ As previously noted, if statutory language is unambiguous, we must give it its plain meaning. *Swanson v. Brewster,* 784 N.W.2d 264, 274 (Minn.2010); *Wynkoop v. Carpenter,* 574 N.W.2d 422, 425 (Minn.1998). A statute's meaning is ambiguous if it is subject to more than one reasonable interpretation. *Swanson,* 784 N.W.2d at 274.

Vertlu and State Auto argue that the compensation judge's interpretation of Minn.Stat. § 176.136, subd. 1b(b), renders meaningless the statutory language providing for a determination on the part of the compensation judge, and ignores dif-

ferences between the language in subdivision 1b(a) and 1b(b), and accordingly is not reasonable. HealthEast argues that the compensation judge's interpretation is the only one that avoids rendering the language "on this basis" meaningless. HealthEast accordingly argues that the compensation judge adopted the only reasonable interpretation of subdivision 1b(b).

Vertlu and State Auto assert that we should interpret Minn.Stat. § 176.136, subd. 1b(b), to allow the compensation judge to determine the reasonable value of treatment and services, which may be any figure below 85 percent of the customary charge or the prevailing charge. They also assert that the compensation judge's interpretation of Minn.Stat. § 176.136, subd. 1b(b), renders meaningless the language "the commissioner or compensation judge may determine the reasonable value of all treatment, services, and supplies." Under Minn.Stat. § 645.16, "[e]very law shall be construed, if possible, to give effect to all its provisions." Vertlu and State Auto argue that there is nothing for the compensation judge to determine if the reasonable value of all treatment, services, and supplies is conclusively set at 85 percent of the lower of the usual and customary charge, or the prevailing charge. We disagree.

Disputes can potentially arise regarding the amount of the usual and customary charge, or the amount of the prevailing charge. As defined in Minn. R. 5221.0500, subp. 2(B)(1), a "usual and customary charge" is "the amount actually billed by the health care provider to all payers for the same service, whether under workers' compensation or not, and regardless of the amount actually reimbursed under a contract or government payment system." Disputes could arise as to how much a health care provider has charged in the past to payers for the same service. Dis-

putes could also arise as to the "prevailing charge." Specifically, establishing the prevailing charge might require a determination of what other hospitals charge for similar treatment and services, and might also require a determination of what sorts of treatment, services, and supplies are "similar" to the treatment, service, or supply being charged. Therefore, we conclude that the WCCA's interpretation of Minn.Stat. § 176.136 does not render meaningless the language "the commissioner or compensation judge may determine the reasonable value of all treatment...."

Vertlu and State Auto also argue that differences in language between subdivision 1b(a) and subdivision 1b(b) require that subdivision 1b(b) be read to allow a compensation judge to specify a reasonable value below 85 percent of the health care provider's usual and customary charge. We have recognized that differences in statutory language can be significant. *See Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 677 n. 4 (Minn.2004) ("The legislature would not have employed different terms in different subdivisions of the statute if it had intended those subdivisions to have the same effect."). But we have only given effect to these differences when interpreting ambiguous statutes. Because we conclude that Minn.Stat. § 176.136 is unambiguous, we decline to give differences in statutory wording interpretive effect. Moreover, statutory differences do not have the significance that Vertlu and State Auto assert that they have in this case. Subdivision 1b(a), which refers to "small hospitals," states that "the liability of the employer for treatment, articles, and supplies provided ... *shall be* the hospital's usual and customary charge, unless the charge is determined by the commissioner or a compensation judge to be unreasonable excessive." (Emphasis added.) In contrast, subdivision 1b(b) pro-

vides that "liability ... *shall be limited to* 85 percent of the provider's usual and customary charge, or 85 percent of the prevailing charges ... whichever is lower." (Emphasis added.)

Vertlu and State Auto argue that if the Legislature had intended 85 percent to be a conclusive figure, rather than just a cap, it would have used the language "shall be," as it did in subdivision 1b(a), instead of the language "shall be limited to." But there are differences in language between subdivisions 1b(a) and 1b(b) that undermine the arguments of Vertlu and State Auto and favor HealthEast's argument. Subdivision 1b(b) explicitly provides that the value shall be 85 percent of the lower of either charge. If the Legislature intended to vest the compensation judge with the authority to freely alter the reasonable charge for treatment, articles, and supplies, it could have so provided, as it did in subdivision 1b(a). Moreover, the use of the term "limited" makes sense in the context of Minn.Stat. § 176.136. It appears that the Legislature intended to limit disputes requiring determination by the compensation judge to three questions: (1) how much is the usual and customary charge; (2) what is the prevailing price for similar treatment; and (3) which is lower? Therefore, we conclude that Vertlu and State Auto's argument that the WCCA's interpretation of Minn.Stat. § 176.136, subd. 1b(b), is unreasonable lacks merit.

■ HealthEast argues that the compensation judge's interpretation of Minn. Stat. § 176.136, subd. 1b(b), is the only reasonable one because it is the only interpretation that avoids rendering statutory language superfluous. Specifically, HealthEast argues that if the compensation judge had the authority to determine a reasonable value below 85 percent of the lower of the usual and customary charge or the prevailing charge, the phrase "on

this basis" as used in subdivision 1b(b) would be meaningless. Again, every law shall be construed to give effect to all of its provisions. Minn.Stat. § 645.16. Here, if the compensation judge had authority to choose a reasonable value of treatment, services, and supplies in any way *other* than determining the lower of the usual and customary charge or the prevailing charge, the language "on this basis" would be meaningless, because the compensation judge would have the authority to determine reasonable value on *any* basis. Because this interpretation of subdivision 1b(b) is unreasonable, we conclude that the WCCA's interpretation of Minn.Stat. § 176.136, subd. 1b(b), is the only reasonable one. Accordingly, we conclude that Minn.Stat. § 176.136 is not ambiguous, and that the statute requires the compensation judge to limit any determination of the reasonable value of treatment and services to establishing the lower of 85 percent of the hospital's usual and customary charge, or 85 percent of the prevailing charge.

Finally, Vertlu and State Auto argue that the WCCA and the compensation judge's conclusion is contrary to legislative policy. Specifically, Vertlu and State Auto argue that Minn.Stat. § 176.136 consistently provides for judicial review, and that by depriving subdivision 1b(b) of judicial oversight, the WCCA's interpretation renders subdivision 1b(b) inconsistent with the rest of Minn.Stat. § 176.136. Again, we look outside the statutory text only if the statute's language is ambiguous. Minn. Stat. § 645.16; *Wynkoop*, 574 N.W.2d at 425. Because we conclude that subdivision 1b(b) is not ambiguous, we need not and do not consider the implied legislative policy argument offered by Vertlu and State Auto.

■ In sum, we hold that Minn.Stat. § 176.136, subd. 1b(b), does not give the compensation judge the authority to deter-

mine a reasonable value of a treatment, service, or supply that is lower than 85 percent of the provider's usual and customary charge, or 85 percent of the prevailing charges for similar treatment, articles, and supplies furnished to an injured person when paid for by the injured person.

Finally, we note that we are sympathetic to Vertlu and State Auto's arguments that the disparity between the price that HealthEast paid to ANS and the price that HealthEast charged to Vertlu and State Auto is large—maybe even unreasonably large. But the question of whether the price paid for the implant hardware was reasonable is not before us. The Legislature and Commissioner have mandated the result we reach in this case. If there is to be any change in the statutory and regulatory structure, it must come from them, not from our court.

Affirmed.