OPINION
GILDE A, Chief Justice.
This consolidated appeal involves the scope of the Minnesota Prevailing Wage Act, Minn.Stat. §§ 177.41-.44 (2014), as applied to hauling activities for state highway projects. The question presented is whether truck drivers hauling asphalt cement from a commercial oil refinery to a contractor’s facility are performing “work under a contract” within the meaning of -Minn.Stat. § 177.44, subd. 1, and therefore must be paid prevailing wages. Relying on an administrative rule that addresses the meaning of “work under a contract,” Minn. R. 5200.1106 (2015), the courts below answered this question in the affirmative. Because we hold that hauling activities must be to, from, or on the site of a public works project to qualify as “work under a contract,” we reverse.
Respondent Minnesota Department of Transportation (MnDOT) awarded contracts to OMG Midwest, Inc., d/b/a Southern Minnesota Construction (SMC); and appellant Hardrives, Inc. (Hardrives) for highway projects. In 2012, the-State contracted vfith SMC for work on Trunk Highway 30 in Blue Earth County. In 2009, the State contracted with Hardrives for work on Trunk Highways 10 and 23 in Benton County.
As the prime contractors for the highway projects, SMC and Hardrives furnished all services and materials needed to complete the work specified in the contracts. As relevant here, SMC and Har-drives agreed to incorporate a particular grade of asphalt cement into the asphalt concrete. mixture furnished to pave the highway surfaces. SMC and- Hardrives *3 further agreed to obtain the asphalt cement from a MnDOT-certified oil refinery. Appellants J.D. Donovan, Inc. (Donovan) and Wayne Transports, Inc. (Wayne) assisted in the acquisition and transport of asphalt cement for the projects.
Donovan provided services for both the SMC project and the Hardrives project. Specifically, Donovan purchased asphalt cement from the oil refineries, resold the asphalt cement to SMC and-. Hardrives, and dispatched truck drivers to haul the asphalt cement from the refineries to SMC’s and Hardrives’s permanent asphalt mixing facilities. At these facilities, the asphalt cement was pumped into, storage tanks for later use in creating asphalt concrete for the projects. Donovan did not make any deliveries to either of the project work sites and did not provide any hauling services at the work sites.
Wayne, a common carrier with for-hire trucking services, provided services for the Hardrives project. During the relevant period, Wayne transported 1,129 loads of asphalt cement from an oil refinery to Hardrives’s permanent asphalt mixing facility. Seven.of these loads were used for the Hardrives. project, although Wayne was not informed that these loads would be used for the project. Wayne did not make any deliveries to the project work site and did not provide any hauling services at the work site.
In addition to awarding contracts for state highway projects, MnDOT is charged with enforcing section 177.44 of the Prevailing Wage Act, which addresses the prevailing wage requirements for state highway projects. Minn.Stat. § 177.44, subd. 7. Following an investigation, the Labor Compliance Unit of MnDOT determined that Hardrives had violated the project contract by failing to ensure .that drivers employed by Donovan were paid prevailing wages. In February 2013, MnDOT notified Hardrives by letter .that hiring subcontractors- to haul “contract-specific oil” directly to its asphalt-plant “in order to produce a contract-specific product” constituted “work under the contract” under Minn. R. 5200.1106, which required the payment of prevailing wage rates. Shortly thereafter; MnDOT sent a similar letter to SMC. MnDOT gave' Hardrives and SMC 20 days to submit certified payroll records demonstrating compliance with the prevailing wage requirements. See Minn. Stat. § 177.44, subd. 7.
In response to the ‘notices, appellants commenced two separate actions in district court against MnDOT, seeking declaratory and injunctive relief. Donovan instituted one action against MnDOT involving the SMC project. Donovan, Wayne, and Har-drives collectively instituted another action against MnDOT involving the Hardrives project. Ih both’ cases, appellants argued that the hauling activities of Donovan and Wayne did not constitute “work under a contract” under Minn.Stat. § 177.44, subd. 1. They claimed that MnDOT was taking a new position on the application of the Prevailing Wage Act to trucking firms. Donovan asserted that it had been providing trucking services on dozens of state highway projects over the previous several years, and MnDOT had never before claimed that hauling asphalt cement from a refinery to a fixed commercial plant location was subject to the prevailing wage requirements. Alternatively, appellants argued that the hauling activities were exempt from the prevailing wage requirements under the “commercial establishment exception” in the Act. See Minn.Stat. § 177.44, subd. 2.[1]
*4 The district courts in- both, cases granted summary judgment to MnDOT. The court of appeals consolidated the cases for appeal and affirmed. J.D. Donovan, Inc. v. Minn. Dep’t of Transp., Nos. A14-0863, A14-1021, 2015 WL 404666, at *6 (Minn, App. Feb.. 2, 2015). The court of appeals concluded that the hauling activities of Donovan and Wayne qualified as “work under a. contract” under Minn. R. 5200.1106, subp. 3(B)(5),. J.D. Donovan, 2015 WL 404666, at *5. In addition, the court of appeals summarily rejected appellants’ arguments concerning the application of the commercial establishment exception. Id. at *5-6. We granted appellants’ petition for review. .
L
At issue here is the meaning of “work under a contract” for state highway projects under the Prevailing Wage Act. Minn.Stat, § 177.44, subd. 1. Under section 177.44, a laborer who is
employed by a contractor, subcontractor, agent, or other person doing or cpntracting to do all or part of the work under a contract ... to which the state is a party, for the construction or maintenance of a highway ... must be paid at least the prevailing wage rate in the same or most similar trade or occupation in the area.
Minn.Stat. § 177.44, subd. 1 (emphasis added); see Minn.Stat. § 177.42, subd. 6 (defining the term “[prevailing wage rate”). The Minnesota Department of Labor and Industry has promulgated administrative rules -that apply to prevailing wage determinations. Minn. R. 5200.1000-.1120 (2015); see MinmStat. § 177.44, subd. 3 (calling for the Department of Labor and Industry to define classes of laborers and to determine prevailing wage rates for all classes of labor commonly employed in highway construction work). MnDOT is responsible for ensuring adherence to the prevailing wage requirements. Minn.Stat. § 177.44, subd. 7. The Act provides fines and penalties for violations of section 177.44, including criminal penalties. See id-., subd. 6 (“A contractor, subcontractor, or agent who violates this section is guilty of a misdemeanor and may be fined not more than $300 or imprisoned not more than 90 days or both.”) In addition, businesses that violate the Act may be barred from working on state' projects for a 3-year period. See Minn.Stat. § 16C.285, subd. 3 (2014) (defining a “[r]e-sponsible contractor” as a contractor that, among other requirements, has not violated the prevailing wage statutes).
The dispute here centers' on whether “work under a contract” with respect to the hauling activities of truck drivers is limited to hauling activities to, from, or on the site of the state highway project. Appellants argue that the hauling activities of Donovan and Wayne do not qualify as “work under a contract” because they Were not máking deliveries to or from a project work site. MnDOT responds that the hauling activities do not have to take place at a project work site in order to qualify as “work under a contract,” stressing that the transport of contract-specific asphalt cement to the prime contractors’ facilities was an integral part of the highway projects.
II.
We begin our analysis by examining the meaning of “work under a contract” in Minn.Stat. § 177.44, subd. 1. Statutory interpretation is a question of law that we review de novo. Krummenacher v. City of Minnetonka, 783 N.W.2d 721, 726 (Minn.2010).
*5 Although the Prevailing Wage Act does not define the term “work under a contract,” section 177.44 provides two examples that help delineate the scope of the Act with respect to the delivery of project materials. The Act does not apply to “the delivery of materials or products by or for commercial establishments which have, a fixed place of business from which they regularly supply the processed or manufactured materials or products,” which is the “commercial establishment exception.” Minn,Stat. § 177.44, subd. 2. But the Act does apply to “laborers or mechanics who deliver mineral aggregate. such as sand, gravel, or stone which is incorporated into the work under the contract by depositing the material substantially in place, directly or through spreaders, from the transporting vehicle.” Id. This statutory context does not constitute a definition of “work under a contract,” but it does confirm that the Legislature did not intend that- all types of hauling activity would be. subject to the Act.[2]
Because the statute does not specifically define the phrase “work under a contract,” the parties agree that we should look principally to the definition of “work under the contract” in Minn. R. 5200.1106 to determine whether the delivery of asphalt cement from an oil refinery to a prime contractor’s asphalt mixing facility is subject to the prevailing wage requirements. See Minn. R. 5200.1106, subp. 2(A) (defining “work under the contract” and indicating that “[t]he term ‘work under a contract’, has the same meaning”). The interpretation of an administrative regulation presents a question of law that we review de novo. In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738 (Alexandria), 768 N.W.2d 303, 310 (Minn.2009); see Citizens Advocating Responsible Dev. v. Kandiyohi Cty. Bd. of Comm’rs, 713 N.W.2d 817, 828 n. 9 (Minn.2006) (noting that administrative regulations are governed by the same rules of construction that apply to statutes).
Our first task is to determine whether the language of the. rule is ambiguous., Johnson v. Paynesville Farmers Union Coop. Oil Co., 817 N.W.2d 693, 707 (Minn.2012). A rule is ambiguous “if it is unclear or reasonably susceptible to more than one reasonable interpretation.” In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance (Annandale), 731 N.W.2d 502, 517 (Minn.2007). Our assessment of whether the rule is ambiguous does not depend on a reading of words or phrases in isolation, “but relies on the meaning assigned to the words or phrases in accordance with the apparent purpose of the regulation, as a whole.” Id.; see also Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes, 806 N.W.2d 17, 24 (Minn.2011) (explaining that we “construe rules ‘as a whole’ and ‘words and sentences are understood ... in the light of their context’ ” (quoting State v. Gaiovnik, 794 N.W.2d 643, 647 (Minn.2011))). If the rule is not ambiguous, “we construe the rule according to. the common and approved usage of its words and phrases and dq not disregard the rule’s plain mean *6 ing to pursue its. spirit.” Troyer, 806 N.W.2d at 24.
Turning to the text of the rule, “work under the contract” generally means:
all construction activities associated with the public works project, including any required hauling activities on the site of or to or from a public works project and work conducted pursuant to a contract ... regardless of whether the construction activity or work is performed by the prime contractor, subcontractor, trucking broker, trucking firms, independent contractor, or employee or agent of any of the foregoing entities, and regardless of which entity or person hires or contracts with another.
Minn. R. 5200.1106, subp. 2(A) (emphasis added); see also id., subp. 4 (specifying certain types of work that are “not considered to be work under a contract,” which relate to the commercial establishment exception). MnDOT argues that the hauling activities of Donovan and Wayne fall within the plain meaning of “work under the contract” because the phrase “construction activities associated with the public works project” specifically encompasses “hauling activities” and work performed by “trucking firms.” Id., subp. 2(A). According to MnDOT, “truck drivers delivering materials to a prime contractor are as much a part of a highway project as any other class of labor.” In addition, MnDOT points out that Rule 5200.1106 references “construction or construction service-related activities” as “including trucking activities.” Id., subp. 2(D) (defining “contractor”).[3] Therefore, MnDOT contends that “[tjrucking activities are plainly recognized as an important function” that is covered by the prevailing wage requirements.
Appellants respond that the definition of “work under the contract” is explicitly limited with respect to hauling activities and includes only “hauling activities on the site of or to or from a public works project.” Minn. R. 5200.1106, subp. 2(A). Although MnDOT contends that the reference to “hauling activities on the site of or to or from a public works project” is simply a nonexclusive example of a type of covered construction activity, appellants assert that interpreting “work under the contract” to encompass all hauling activities associated with a public works project would render the reference to “on the site of or to or from a public works project” superfluous and insignificant. See Troyer, 806 N.W.2d at 24 (“When possible, ‘no word, phrase, or sentence should' be deemed superfluous, void, or insignificant.’ ” (quoting Krueger v. Zeman Constr. Co., 781 N.W.2d 858, 861 (Minn.2010))). •
MnDOT also relies on Minn. R. 5200.1106, subp. 3(B), which provides six specific examples of hauling activities that are considered “work under the contract” for purposes of prevailing wage requirements. Five of the six examples — (1) through (4) and (6) — specifically reference hauling activities to, from, or on the site of a project work site: . .
(1) the hauling of any or all stockpiled or excavated materials on the project work site to other locations on the same project even if the trucks leave the work site at some point;
(2) the delivery of materials from any facility that does not meet the require *7 ments of a commercial establishment to the project and the return haul to the starting location either empty or loaded;
(3) the delivery of materials from another construction project site to the public works project and the return haul empty or loaded is considered work under the contract. Construction projects, are not considered a commercial establishment;
(4) the hauling required to remove any materials from the public works project to a location off the project site and the return haul if empty or if loaded from other than'a commercial establishment;
(5) the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment; and
(6) delivery of sand, gravel, or rock, by or for a commercial establishment, which is deposited “substantially in place, ” either directly or through spreaders from the transporting vehicles is work under the contract. In addition, the return haul to the off-site facility empty or loaded' is also considered work under the contract.
Minn. R. 5200.1106, subp. 3(B) (emphasis added). MnDOT’s argument that the hauling activities here are covered construction activities focuses on the. fifth example: “the delivery of ■ materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from- a commercial establishment,” Id., subp. 3(B)(5). According to MnDOT, the plain language of this provision specifically covers the hauling activities here because Donovan and Wayne were hired by project contractors to deliver'asphalt cemént from oil refineries, which MnDOT contends are “commercial establishments” under the rule. See id., subp. 5(F) (defining “commercial establishment”).[4]
For their part, appellants contend that the fifth example, when read in context, applies only to deliveries “from a commercial establishment” to a project work site: Id., subp. 3(B)(5). Appellants stress that the overarching definition of “work under the contract” as applied to “hauling activities” means “hauling activities on the site of or to or from a public works project.” Id., subp. 2(A). ’ It makes no sense, appellants argue, for the specific examples in subpart 3(B) to be read more broadly than the overarching definition in subpart 2(A), noting that all of the other examples are specifically limited to hauling activities to, from, or on the project work site.[5]
*8 The broad definition of the phrase “work under the contract’’ as encompassing “all construction activities associated with the public works project” provides a basis for more than one reasonable interpretation of the phrase as applied to hauling activities. Id., subp. 2(A). Read broadly, “all construction activities associated with the public works project” could reasonably be construed to include deliveries of asphalt cement to the prime contractors’ facilities because Donovan and Wayne were delivering construction materials needed for the highway projects. But when we read the rule in its entirety, it is not unreasonable to conclude that the phrase “work under the contract,” as applied to hauling activities, is limited. to hauling activities to, from, or on the project work site. In fact, the principal definition of “work under the contract” in Minn. R. 5200.1106, subp. 2(A), specifically references hauling activities “on the site of or to • or from a public works project,” making it reasonable to interpret the limitation as specifying the scope of covered hauling activities. Moreover, .the repeated references to the project work site in the examples of hauling activities that are considered to be “work under the contract” in Minn. R. 5200.1106, subp. 8(B), could reasonably be construed as confirmation that hauling activities that are not to, from, or on the project work site fall outside the scope of the prevailing wage requirements. Cf. McBoyle v. United States, 288 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931) (declining “to read words that so carefully enumerate the different forms of motor vehicles” that .are subject to the National Motor Vehicle Theft Act as including airplanes where the statute contains “no reference of any kind to aircraft”). Therefore, because there is more than one reasonable interpretation of Minn. R. 5200.1106, we conclude that the phrase “work under the contract” is ambiguous with respect to deliveries of construction materials that are not to or from a project work site.[6]
*9 III.
Having ' concluded that the meaning of “work under the contract” is ambiguous with respect to hauling activities that are not to, from, or on the project work site, “we apply canons of construction to determine the intent of the rule makers,” Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes, 806 N.W.2d 17, 25 (Minn.2011), including consideration of the “rulemaking record,” Citizens Advocating Responsible Dev. v. Kandiyohi Cty. Bd. of Comm’rs, 713 N.W.2d 817, 828 (Minn.2006). See generally Minn.Stat. § 645.16 (2014) (listing factors that may be considered “[w]hen the words of a law are not explicit”). In addition, we strictly construe “provisions that provide for a penalty.” Brekke v. THM Biomedical, Inc., 683 N.W.2d 771, 774 (Minn.2004); see also Chatfield v. Henderson, 252 Minn. 404, 410, 90 N.W.2d 227, 232 (1958).[7]
In previous cases involving the interpretation of an ambiguous administrative rule, we have relied on statements of need and reasonableness (SONARs) “as evidence of the extrinsic factors listed in Minn.Stat. § 645.16.” Troyer, 806 N.W.2d at 27; see Minn.Stat. § 14.131 (2014) (stating that “the agency must prepare ... a statement of the need for and reasonableness of the rule,” including “a description of the classes of persons who probably will be affected” and the “probable costs of complying with the proposed rule”). For example, in Citizens Advocating', we examined “the rulemaking record,” including SONARs, “to determine what the rulemakers intended.” 713 N.W.2d at 830. We proceed to do the same here.
Since the enactment of the Prevailing Wage Act in 1973, the Department of Labor and Industry (DLI) has worked with MnDOT, often “closely,” in promulgating the administrative rules that interpret the Prevailing Wage Act. 1994 SONAR 2. Pursuant to Minn. Stat. § 177.44, subd. 3, DLI has identified five general “classes of labor” for state highway projects that are subject to the prevailing wage requirements: laborers, power equipment operators, truck drivers, special equipment, and special crafts. Minn. R. 5200.1040. For each general class, the rules provide specific codes and classifications that contractors are required to use in “documenting classes of labor.” Minn. R. 5200.1100, subp. 1(A); see id., subp. 4 (addressing truck drivers). Significantly, in 1995, DLI described the subpart addressing truck drivers as identifying “the individual trucks which may be used to haul material to, from, or about a construction project.” 1995 SONAR 23 (emphasis added). In other words, DLI did not consider hauling materials between two off-project sites, in *10 preparation for construction, to be subject to the prevailing wage requirements. Rather, DLI expressed its understanding that only truck drivers hauling materials to, from, or about a construction project were performing work subject to the prevailing wage requirements.
In 2001, DLI promulgated Minn. R. 5200.1106 to further clarify the application of the prevailing wage requirements to truck drivers. 2000, SONAR 3, 8, 23-26, 33-34. According to DLI, the promulgation of Rule 5200.1106 was meant to ensure that the Prevailing Wage Act covered “labor costs associated with the hauling of asphalt, concrete, aggregate, and borrow to highway construction sites.” 2000 SONAR 8. With respect to the hauling activities that are listed in Minn. R. 5200.1106, subp. 3(B), as examples of “work under the contract,” DLI explained that the examples were “intended to ensure that drivers [were] paid prevailing wages for hauling both to. and from the construction site.” 2000 SONAR 35 (emphasis added). In particular, the example in Minn. R. 5200.1106, subp. 3(B)(5), on which MnDOT now relies — “the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment”— was intended to clarify that the payment of prevailing wages for hauling materials to the project site was required, “even when [trucks hired by the contractor were] delivering from a commercial establishment.” 2000 SONAR 36.[8] Thus, according to the 2000 SONAR, the language “on the site of or to or from a public works project,” which is part of the definition of “work under the contract” in Minn, R. 5200.1106, subp. 2(A), was intended to apply to all six examples of hauling activities in Minn. R. 5200.1106, subp. 3(B), even example (5), which does not specifically reference the project work site.
In sum, the rulemaking history of Minn. R. 5200.1106 makes it clear that DLI considered only those truck drivers who are hauling materials “on the site of or to or from a public works project” to be engaging in “construction activities” that constitute “work under a contract” under the Prevailing Wage Act. Indeed, at oral argument, MnDOT admitted that it had never previously attempted to apply the Act to the types of hauling activities at issue here: deliveries of asphalt concrete from oil refineries to the facilities of prime contractors. MnDOT submitted, however, that this was évidence not of its interpretation of the Act, but was inerely a matter of “non-enforcement.” But, as the Supreme Court has recognized,' although agency enforcement power cannot simply “evaporate through lack of administrative exercise,” it is also true that “the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.” Fed. Trade Comm’n v. Bunte Bros., Inc., 312 U.S. 349, 351-52, 61 S.Ct. 580, 85 L.Ed. 881 (1941) (concluding that the Federal Trade Commission’s 25-year-long failure to assert the power it *11 was then claiming was a “powerful indication” of the scope of the act at issue). In even clearer terms, in Bankamerica Carp, v. United, States, the Court underscored the significance of an agency’s inconsistent enforcement history, noting that the Federal Trade Commission had “made no attempt” in 60 years to enforce an act with respect to activities it was claiming were covered, despite those activities being “widespread and a matter of public record throughout the period.” 462 U.S. 122, 130, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983). The Court found it “difficult'to' believe” that the FTC, the Department of Justice, and Congress all would have “overlooked or ignored the pervasive and open practice [at issue] had it been thought contrary to the law.” Id. at 130-31, 103 S.Ct. . 2266. We likewise find it difficult to believe that DLI, MnDOT, and the Legislature all hap-, pened to overlook or ignore open and pervasive hauling activities — hauling activities that are customary in the construction industry — for more than two decades had they understood that those hauling activities required the payment of prevailing wages.
Interpreting “work under the contract” narrowly also is consistent with our rules of construction pertaining to the interpretation of statutes that impose penalties. See, e.g., Brekke, 683 N.W.2d at 774. In light of the focus on “hauling activities on the site of or to or from a public works project” in Minn. R. 5200.1106, subp. 2(A), we decline to interpret “work under the contract” broadly to cover hauling activities that are not to, from, or on the project work site — activities MnDOT has never previously treated as construction activities subject to the Prevailing Wage Act. And although MnDOT cites the criminal penalty provision in Minn.Stat. § 177.44, subd. 6, as evidence of “the important purpose” the Act serves, “it is reasonable that a fair warning should be given” when a statute imposes criminal penalties, and “so far as possible the line should be clear.” McBoyle, 283 U.S. at 27, 51 S.Ct. 340; see also State v. Rick, 835 N.W.2d 478, 486 (Minn.2013) (articulating the rule that “ ‘no citizen should be held accountable for a violation- of a statute whose commands are uncertain’ ” (quoting United States v. Santas, 553 U.S. 507, 514, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008))). In this case, the line between covered-and non-covered hauling activities was not clear with respect to deliveries of- construction materials that are not to or from - a project work site.
In accordance with DLI’s longstanding interpretation of the phrase “work under the contract,” as expressed through the rulemaking history, as well as our rule of narrow construction that applies when a statute imposes penalties, we hold that Minn. R. 5200.1106 requires that hauling activities be to, from, or at the site of a public works project in order to constitute '“work under a contract” -within the meaning of the Prevailing Wage Act. Because the hauling activities of Donovan and Wayne were not to, from,' or on the project work sites, the hauling activities' do not constitute “work under the contract” subject to the prevailing wage requirements. Therefore, we reverse the decision of the court of appeals, which affirmed summary judgment in favor of MnDOT.
Reversed.
HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.
OHUTICH, J., took no part in the consideration or decision of this case.

. Because we conclude that the hauling activities are not “work under the contract” for purposes of the Act, it is not necessary for us to resolve the commercial establishment issue *4 appellants raise. See Minn.Stat. § 177.44, subd. 2.

. In concluding that the Act covers all types of hauling activity connected in any way to a state highway project, the dissent ignores this statutory context. The dissent’s simplistic reading of the phrase “work under the contract” would also mean that the Department of Transportation has been in violation of the Act for decades. This is so because the Legislature directed the Department of Transportation to "require adherence to”. the statute, Minn.Stat. § 177.44, subd. 7. But, as we know from the record here, the Department has never, before this case, required truckers engaged in the type of hauling at issue here to “adhere[ ] to" the Act.

. The parties dispute whether Donovan and Wayne are “contractors” within the meaning of Minn. R. 5200,1106,. subp. 2(D). Appellants contend that the 'provision of asphalt cement and related hauling activities makes Donovan and Wayne "more akin to a material supplier than, a contractor.” Because we conclude that the hauling activities of Donovan and Wayne do not constitute “work under the contract” under Minn. R. 5200.1106, subp. 2(A), we need not reach this issue.

. If, as the dissent concludes, the Act covers all hauling activity connected to a state highway project, it is difficult to understand why the rule drafters would have gone to the trouble to write these detailed and lengthy examples. Indeed, the dissent’s interpretation of the statute renders large portions of the rule superfluous, because, if as the dissent asserts, 'all hauling activity connected in any way with a state highway project is covered, there is no purpose for all of the specific, detailed examples in the rule of the types of hauling activities that are covered. We are not empowered to render all of these examples null. Our obligation, instead, is to interpret the rule in a way that gives effect to all of the rule’s provisions, Troyer, 806 N.W.2d at 24.

. Appellants also argue that there is a fact dispute over whether the oil refineries that supplied the asphalt: cement here are "commercial establishment[s].” ■ See Minn. R. 5200.1106, subp. 5(F) (stating that "[t]he determination of whether a facility is a- ‘commercial establishment- is made on a location-by-location basis and on a product-by-product basis”). Because we conclude that the hauling activities are not “work under'the contract” for purposes of the prevailing wage requirements, it is not necessary for us to interpret or apply the commercial establishment exception. But see infra n. 8 (discussing the rationale behind the example in Minn. R, 5200.1106, subp. 3(B)(5) as expressed in the Statement of Need and Reasonableness).

. The dissent proclaims that the words "work under a contract” in Minn.Stat. § 177.44, subd. 1, are clear and free from ambiguity and that applying the statute “to the facts in this case is not a difficult task.” But, in the rulemaking proceeding for Rule 5200.1106, the administrative law judge (ALJ) found that there had been “very different and divergent understandings” of the meaning of "work under a contract” in connection with the work of truck drivers; in fact, as of 2001 — almost 30, years after its'enactment — the Prevailing Wage Act had "not been implemented for many truck drivers making deliveries to state-funded projects because of disputes” about the prevailing wage requirements. Minn. Office of Admin. Hrgs., Proposed Amendments to Rules Governing Prevailing Wages; Trucking, Minnesota Rules, Chapter 5200, Report of the Administrative Law Judge, OAH 12-1900-13145-1, 2001 WL 702292, at *6, *11 (Jan. 30, .2001) (ALJ Report). Consequently, the definition and examples in Rule 5200.1106 .were intended to clarify that deliveries to project, sites constitute "w.ork under a contract.” See infra § III. It is not “that simple,” as the dissent claims, to classify deliveries of asphalt cement from a commercial oil refinery to a contractor’s facility. To begin with, these deliveries are not obvious "construction activities” under Minn. R. 5200.1106, subp. 2(A). See ALJ Report, at *11 (stating that the delivery of "mineral aggregates to an asphalt or ready mix production facility” does not constitute a "construction activity”); cf, 26 C.F.R. § 1.199-3 (2015) (specifying that “[ajctivities constituting construction” for purposes of determining domestic production gross receipts under the Internal Revenue Code generally "do not include tangential services such as ... delivering materials, even if the tangential services are essential for construction”). Moreover, because the contractor’s facilities serve the general public in addition to public works projects, it may not always be clear to aggregate suppliers or to the truckers which deliveries contain construction materials that will be used for state highway projects. For example, according to Wayne, .the bills of lading for the deliveries of asphalt cement here were issued by the refinery, and Wayne did not know at the time that *9 any of the deliveries were related to a state highway project.

. Generally, we defer to an agency’s reasonable, longstanding interpretation of an ambiguous rule. Annandale, 731 N.W.2d at 513—14, 516. On the other hand, when an agency's interpretation of an ambiguous rule is recent or has not been consistent but is instead tantamount to a litigation position, deference is. not appropriate. Id, at 521, We have explained that an agency’s consistent and longstanding interpretation "may have encouraged reliance by the public’.’ and may signal the delegating authority’s view "either that the interpretation is correct or that the authority has willingly acquiesced to the agency’s interpretation”; but, when the agency interpretation is more recent, "any reliance interest is diminished, and changed or new interpretations may be the product of political opportunism rather than good-faith efforts at interpretation.” Id. at 528. Because the broad interpretation of “work under the contract” now advanced by MnDOT is not a longstanding interpretation of Minn. R. 5200.1106, the broad interpretation does not warrant deference. Indeed, MnDOT does not even argue that we must defer to its interpretation of the rule.

. This clarification was necessary, DLI believed, to distinguish these types of hauling activities from'the hauling activities that fall within the scope of the commercial establishment exception. 2000 SONAR 36; see Minn. Stat. § 177.44, subd. 2 (providing that drivers hauling materials "by or for commercial establishments " fall within the scope of the commercial establishment exception (emphasis added)). DLI sought to clarify that drivers hauling materials on behalf of the contractor, albeit departing from a commercial establishment, are covered by the prevailing wage requirements, as made clear by the example in Minn. R. 5200.1106, subp. 3(B)(5). 2000 SONAR 36. Thus,-the example in subpart 3(B)(5) was intended to distinguish hauling activities from a commercial establishment to the project site from exempt hauling activities.