STATE OF MINNESOTA

IN SUPREME COURT

A14-0863
A14-1021

Court of Appeals                                                    Gildea, C.J.
                                            Dissenting, Lillehaug and Stras, JJ.
J.D. Donovan, Inc., et al.,                  Took no part, Hudson and Chutich, JJ.

                    Appellants,

vs.

                                                        Filed:  April 20, 2016
Minnesota Department of                          Office of Appellate Courts
Transportation, et al.,

                    Respondents.

_____

Thomas Revnew, Tara Craft Adams, Seaton, Peters & Revnew, P.A., Minneapolis, Minnesota, for appellants.

Lori Swanson, Attorney General, Mathew Ferche, Assistant Attorney General, Saint Paul, Minnesota, for respondents.

Brendan D. Cummins, Justin D. Cummins, Cummins & Cummins, LLP, Minneapolis, Minnesota, for amicus curiae Minnesota State Building and Construction Trades Council.

_____

S Y L L A B U S

The transport of asphalt cement from a commercial oil refinery to a contractor's facility is not subject to the Prevailing Wage Act because the scope of hauling activities considered to be "work under the contract" under Minn. R. 5200.1106 (2015) is limited to hauling activities to, from, or on the site of a public works project.

Reversed.

1

O P I N I O N

GILDEA, Chief Justice.

This consolidated appeal involves the scope of the Minnesota Prevailing Wage Act, Minn. Stat. §§ 177.41–.44 (2014), as applied to hauling activities for state highway projects. The question presented is whether truck drivers hauling asphalt cement from a commercial oil refinery to a contractor's facility are performing "work under a contract" within the meaning of Minn. Stat. § 177.44, subd. 1, and therefore must be paid prevailing wages. Relying on an administrative rule that addresses the meaning of "work under a contract," Minn. R. 5200.1106 (2015), the courts below answered this question in the affirmative. Because we hold that hauling activities must be to, from, or on the site of a public works project to qualify as "work under a contract," we reverse.

Respondent Minnesota Department of Transportation (MnDOT) awarded contracts to OMG Midwest, Inc., d/b/a Southern Minnesota Construction (SMC), and appellant Hardrives, Inc. (Hardrives) for highway projects. In 2012, the State contracted with SMC for work on Trunk Highway 30 in Blue Earth County. In 2009, the State contracted with Hardrives for work on Trunk Highways 10 and 23 in Benton County.

As the prime contractors for the highway projects, SMC and Hardrives furnished all services and materials needed to complete the work specified in the contracts. As relevant here, SMC and Hardrives agreed to incorporate a particular grade of asphalt cement into the asphalt concrete mixture furnished to pave the highway surfaces. SMC and Hardrives further agreed to obtain the asphalt cement from a MnDOT-certified oil

2

refinery. Appellants J.D. Donovan, Inc. (Donovan) and Wayne Transports, Inc. (Wayne) assisted in the acquisition and transport of asphalt cement for the projects.

Donovan provided services for both the SMC project and the Hardrives project. Specifically, Donovan purchased asphalt cement from the oil refineries, resold the asphalt cement to SMC and Hardrives, and dispatched truck drivers to haul the asphalt cement from the refineries to SMC's and Hardrives's permanent asphalt mixing facilities. At these facilities, the asphalt cement was pumped into storage tanks for later use in creating asphalt concrete for the projects. Donovan did not make any deliveries to either of the project work sites and did not provide any hauling services at the work sites.

Wayne, a common carrier with for-hire trucking services, provided services for the Hardrives project. During the relevant period, Wayne transported 1,129 loads of asphalt cement from an oil refinery to Hardrives's permanent asphalt mixing facility. Seven of these loads were used for the Hardrives project, although Wayne was not informed that these loads would be used for the project. Wayne did not make any deliveries to the project work site and did not provide any hauling services at the work site.

In addition to awarding contracts for state highway projects, MnDOT is charged with enforcing section 177.44 of the Prevailing Wage Act, which addresses the prevailing wage requirements for state highway projects. Minn. Stat. § 177.44, subd. 7. Following an investigation, the Labor Compliance Unit of MnDOT determined that Hardrives had violated the project contract by failing to ensure that drivers employed by Donovan were paid prevailing wages. In February 2013, MnDOT notified Hardrives by letter that hiring subcontractors to haul "contract-specific oil" directly to its asphalt plant "in order to

3

produce a contract-specific product" constituted "work under the contract" under Minn. R. 5200.1106, which required the payment of prevailing wage rates. Shortly thereafter, MnDOT sent a similar letter to SMC. MnDOT gave Hardrives and SMC 20 days to submit certified payroll records demonstrating compliance with the prevailing wage requirements. *See* Minn. Stat. § 177.44, subd. 7.

In response to the notices, appellants commenced two separate actions in district court against MnDOT, seeking declaratory and injunctive relief. Donovan instituted one action against MnDOT involving the SMC project. Donovan, Wayne, and Hardrives collectively instituted another action against MnDOT involving the Hardrives project. In both cases, appellants argued that the hauling activities of Donovan and Wayne did not constitute "work under a contract" under Minn. Stat. § 177.44, subd. 1. They claimed that MnDOT was taking a new position on the application of the Prevailing Wage Act to trucking firms. Donovan asserted that it had been providing trucking services on dozens of state highway projects over the previous several years, and MnDOT had never before claimed that hauling asphalt cement from a refinery to a fixed commercial plant location was subject to the prevailing wage requirements. Alternatively, appellants argued that the hauling activities were exempt from the prevailing wage requirements under the "commercial establishment exception" in the Act. *See* Minn. Stat. § 177.44, subd. 2.[1]

---

[1] Because we conclude that the hauling activities are not "work under the contract" for purposes of the Act, it is not necessary for us to resolve the commercial establishment issue appellants raise. *See* Minn. Stat. § 177.44, subd. 2.

4

The district courts in both cases granted summary judgment to MnDOT. The court of appeals consolidated the cases for appeal and affirmed. *J.D. Donovan, Inc. v. Minn. Dep't of Transp.*, Nos. A14-0863, A14-1021, 2015 WL 404666, at *6 (Minn. App. Feb. 2, 2015). The court of appeals concluded that the hauling activities of Donovan and Wayne qualified as "work under a contract" under Minn. R. 5200.1106, subp. 3(B)(5). *J.D. Donovan*, 2015 WL 404666, at *5. In addition, the court of appeals summarily rejected appellants' arguments concerning the application of the commercial establishment exception. *Id.* at *5-6. We granted appellants' petition for review.

I.

At issue here is the meaning of "work under a contract" for state highway projects under the Prevailing Wage Act. Minn. Stat. § 177.44, subd. 1. Under section 177.44, a laborer who is

> employed by a contractor, subcontractor, agent, or other person doing or contracting to do all or part of the *work under a contract* . . . to which the state is a party, for the construction or maintenance of a highway . . . must be paid at least the prevailing wage rate in the same or most similar trade or occupation in the area.

Minn. Stat. § 177.44, subd. 1 (emphasis added); *see* Minn. Stat. § 177.42, subd. 6 (defining the term "[p]revailing wage rate"). The Minnesota Department of Labor and Industry has promulgated administrative rules that apply to prevailing wage determinations. Minn. R. 5200.1000–.1120 (2015); *see* Minn. Stat. § 177.44, subd. 3 (calling for the Department of Labor and Industry to define classes of laborers and to determine prevailing wage rates for all classes of labor commonly employed in highway construction work). MnDOT is responsible for ensuring adherence to the

5

prevailing wage requirements. Minn. Stat. § 177.44, subd. 7. The Act provides fines and penalties for violations of section 177.44, including criminal penalties. *See id.*, subd. 6 ("A contractor, subcontractor, or agent who violates this section is guilty of a misdemeanor and may be fined not more than $300 or imprisoned not more than 90 days or both.") In addition, businesses that violate the Act may be barred from working on state projects for a 3-year period. *See* Minn. Stat. § 16C.285, subd. 3 (2014) (defining a "[r]esponsible contractor" as a contractor that, among other requirements, has not violated the prevailing wage statutes).

The dispute here centers on whether "work under a contract" with respect to the hauling activities of truck drivers is limited to hauling activities to, from, or on the site of the state highway project. Appellants argue that the hauling activities of Donovan and Wayne do not qualify as "work under a contract" because they were not making deliveries to or from a project work site. MnDOT responds that the hauling activities do not have to take place at a project work site in order to qualify as "work under a contract," stressing that the transport of contract-specific asphalt cement to the prime contactors' facilities was an integral part of the highway projects.

## II.

We begin our analysis by examining the meaning of "work under a contract" in Minn. Stat. § 177.44, subd. 1. Statutory interpretation is a question of law that we review de novo. *Krummenacher v. City of Minnetonka*, 783 N.W.2d 721, 726 (Minn. 2010).

Although the Prevailing Wage Act does not define the term "work under a contract," section 177.44 provides two examples that help delineate the scope of the Act

6

with respect to the delivery of project materials. The Act does not apply to "the delivery of materials or products by or for commercial establishments which have a fixed place of business from which they regularly supply the processed or manufactured materials or products," which is the "commercial establishment exception." Minn. Stat. § 177.44, subd. 2. But the Act does apply to "laborers or mechanics who deliver mineral aggregate such as sand, gravel, or stone which is incorporated into the work under the contract by depositing the material substantially in place, directly or through spreaders, from the transporting vehicle." *Id*. This statutory context does not constitute a definition of "work under a contract," but it does confirm that the Legislature did not intend that all types of hauling activity would be subject to the Act.[2]

Because the statute does not specifically define the phrase "work under a contract," the parties agree that we should look principally to the definition of "work under the contract" in Minn. R. 5200.1106 to determine whether the delivery of asphalt cement from an oil refinery to a prime contactor's asphalt mixing facility is subject to the prevailing wage requirements. *See* Minn. R. 5200.1106, subp. 2(A) (defining "work under the contract" and indicating that "[t]he term 'work under a contract' has the same meaning"). The interpretation of an administrative regulation presents a question of law

---

[2] In concluding that the Act covers all types of hauling activity connected in any way to a state highway project, the dissent ignores this statutory context. The dissent's simplistic reading of the phrase "work under the contract" would also mean that the Department of Transportation has been in violation of the Act for decades. This is so because the Legislature directed the Department of Transportation to "require adherence to" the statute. Minn. Stat. § 177.44, subd. 7. But, as we know from the record here, the Department has never, before this case, required truckers engaged in the type of hauling at issue here to "adhere[] to" the Act.

that we review de novo. *In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738* (*Alexandria*), 763 N.W.2d 303, 310 (Minn. 2009); *see Citizens Advocating Responsible Dev. v. Kandiyohi Cty. Bd. of Comm'rs*, 713 N.W.2d 817, 828 n.9 (Minn. 2006) (noting that administrative regulations are governed by the same rules of construction that apply to statutes).

Our first task is to determine whether the language of the rule is ambiguous. *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 707 (Minn. 2012). A rule is ambiguous "if it is unclear or reasonably susceptible to more than one reasonable interpretation." *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance* (*Annandale*), 731 N.W.2d 502, 517 (Minn. 2007). Our assessment of whether the rule is ambiguous does not depend on a reading of words or phrases in isolation, "but relies on the meaning assigned to the words or phrases in accordance with the apparent purpose of the regulation as a whole." *Id.*; *see also Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes*, 806 N.W.2d 17, 24 (Minn. 2011) (explaining that we "construe rules 'as a whole' and 'words and sentences are understood . . . in the light of their context' " (quoting *State v. Gaiovnik*, 794 N.W.2d 643, 647 (Minn. 2011))). If the rule is not ambiguous, "we construe the rule according to the common and approved usage of its words and phrases and do not disregard the rule's plain meaning to pursue its spirit." *Troyer*, 806 N.W.2d at 24.

Turning to the text of the rule, "work under the contract" generally means:

> all construction activities associated with the public works project, *including any required hauling activities on the site of or to or from a public works project* and work conducted pursuant to a contract . . . regardless of whether the construction activity or work is performed by the prime contractor, subcontractor, trucking broker, trucking firms, independent contractor, or employee or agent of any of the foregoing entities, and regardless of which entity or person hires or contracts with another.

Minn. R. 5200.1106, subp. 2(A) (emphasis added); *see also id.*, subp. 4 (specifying certain types of work that are "not considered to be work under a contract," which relate to the commercial establishment exception). MnDOT argues that the hauling activities of Donovan and Wayne fall within the plain meaning of "work under the contract" because the phrase "construction activities associated with the public works project" specifically encompasses "hauling activities" and work performed by "trucking firms." *Id.*, subp. 2(A). According to MnDOT, "truck drivers delivering materials to a prime contractor are as much a part of a highway project as any other class of labor." In addition, MnDOT points out that Rule 5200.1106 references "construction or construction service-related activities" as "including trucking activities." *Id.*, subp. 2(D) (defining "contractor").[3] Therefore, MnDOT contends that "[t]rucking activities are

---

[3] The parties dispute whether Donovan and Wayne are "contractors" within the meaning of Minn. R. 5200.1106, subp. 2(D). Appellants contend that the provision of asphalt cement and related hauling activities makes Donovan and Wayne "more akin to a material supplier than a contractor." Because we conclude that the hauling activities of Donovan and Wayne do not constitute "work under the contract" under Minn. R. 5200.1106, subp. 2(A), we need not reach this issue.

plainly recognized as an important function" that is covered by the prevailing wage requirements.

Appellants respond that the definition of "work under the contract" is explicitly limited with respect to hauling activities and includes only "hauling activities on the site of or to or from a public works project." Minn. R. 5200.1106, subp. 2(A). Although MnDOT contends that the reference to "hauling activities on the site of or to or from a public works project" is simply a nonexclusive example of a type of covered construction activity, appellants assert that interpreting "work under the contract" to encompass all hauling activities associated with a public works project would render the reference to "on the site of or to or from a public works project" superfluous and insignificant. *See Troyer*, 806 N.W.2d at 24 ("When possible, 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.' " (quoting *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 861 (Minn. 2010))).

MnDOT also relies on Minn. R. 5200.1106, subp. 3(B), which provides six specific examples of hauling activities that are considered "work under the contract" for purposes of prevailing wage requirements. Five of the six examples—(1) through (4) and (6)—specifically reference hauling activities to, from, or on the site of a project work site:

> (1)    the hauling of any or all stockpiled or excavated materials *on the project work site to other locations on the same project* even if the trucks leave the work site at some point;

> (2)    the delivery of materials from any facility that does not meet the requirements of a commercial establishment *to the project and the return haul* to the starting location either empty or loaded;

(3)     the delivery of materials *from another construction project site to the public works project and the return haul* empty or loaded is considered work under the contract. Construction projects are not considered a commercial establishment;

(4)     the hauling required to remove any materials *from the public works project to a location off the project site and the return haul* if empty or if loaded from other than a commercial establishment;

(5)     the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment; and

(6)     delivery of sand, gravel, or rock, by or for a commercial establishment, which is *deposited "substantially in place," either directly or through spreaders from the transporting vehicles* is work under the contract. *In addition, the return haul to the off-site facility* empty or loaded is also considered work under the contract.

Minn. R. 5200.1106, subp. 3(B) (emphasis added).  MnDOT's argument that the hauling activities here are covered construction activities focuses on the fifth example: "the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment." *Id.*, subp. 3(B)(5).  According to MnDOT, the plain language of this provision specifically covers the hauling activities here because Donovan and Wayne were hired by project contractors to deliver asphalt cement from oil refineries, which MnDOT contends are "commercial establishments" under the rule. *See id.*, subp. 5(F) (defining "commercial establishment").[4]

---

[4]     If, as the dissent concludes, the Act covers all hauling activity connected to a state highway project, it is difficult to understand why the rule drafters would have gone to the trouble to write these detailed and lengthy examples.  Indeed, the dissent's interpretation of the statute renders large portions of the rule superfluous, because, if as the dissent asserts, all hauling activity connected in any way with a state highway project is covered, there is no purpose for all of the specific, detailed examples in the rule of the types of hauling activities that are covered.  We are not empowered to render all of these
(Footnote continued on next page.)

11

For their part, appellants contend that the fifth example, when read in context, applies only to deliveries "from a commercial establishment" *to* a project work site. *Id.*, subp. 3(B)(5). Appellants stress that the overarching definition of "work under the contract" as applied to "hauling activities" means "hauling activities on the site of or to or from a public works project." *Id.*, subp. 2(A). It makes no sense, appellants argue, for the specific examples in subpart 3(B) to be read more broadly than the overarching definition in subpart 2(A), noting that all of the other examples are specifically limited to hauling activities to, from, or on the project work site.[5]

The broad definition of the phrase "work under the contract" as encompassing "all construction activities associated with the public works project" provides a basis for more than one reasonable interpretation of the phrase as applied to hauling activities. *Id.*, subp. 2(A). Read broadly, "all construction activities associated with the public works project" could reasonably be construed to include deliveries of asphalt cement to the prime contractors' facilities because Donovan and Wayne were delivering construction

---

(Footnote continued from previous page.)
examples null. Our obligation, instead, is to interpret the rule in a way that gives effect to all of the rule's provisions. *Troyer*, 806 N.W.2d at 24.

[5] Appellants also argue that there is a fact dispute over whether the oil refineries that supplied the asphalt cement here are "commercial establishment[s]." *See* Minn. R. 5200.1106, subp. 5(F) (stating that "[t]he determination of whether a facility is a 'commercial establishment' is made on a location-by-location basis and on a product-by-product basis"). Because we conclude that the hauling activities are not "work under the contract" for purposes of the prevailing wage requirements, it is not necessary for us to interpret or apply the commercial establishment exception. *But see infra* n.8 (discussing the rationale behind the example in Minn. R. 5200.1106, subp. 3(B)(5) as expressed in the Statement of Need and Reasonableness).

materials needed for the highway projects. But when we read the rule in its entirety, it is not unreasonable to conclude that the phrase "work under the contract," as applied to hauling activities, is limited to hauling activities to, from, or on the project work site. In fact, the principal definition of "work under the contract" in Minn. R. 5200.1106, subp. 2(A), specifically references hauling activities "on the site of or to or from a public works project," making it reasonable to interpret the limitation as specifying the scope of covered hauling activities. Moreover, the repeated references to the project work site in the examples of hauling activities that are considered to be "work under the contract" in Minn. R. 5200.1106, subp. 3(B), could reasonably be construed as confirmation that hauling activities that are not to, from, or on the project work site fall outside the scope of the prevailing wage requirements. *Cf. McBoyle v. United States*, 283 U.S. 25, 27 (1931) (declining "to read words that so carefully enumerate the different forms of motor vehicles" that are subject to the National Motor Vehicle Theft Act as including airplanes where the statute contains "no reference of any kind to aircraft"). Therefore, because there is more than one reasonable interpretation of Minn. R. 5200.1106, we conclude that the phrase "work under the contract" is ambiguous with respect to deliveries of construction materials that are not to or from a project work site.[6]

---

[6] The dissent proclaims that the words "work under a contract" in Minn. Stat. § 177.44, subd. 1, are clear and free from ambiguity and that applying the statute "to the facts in this case is not a difficult task." But, in the rulemaking proceeding for Rule 5200.1106, the administrative law judge (ALJ) found that there had been "very different and divergent understandings" of the meaning of "work under a contract" in connection with the work of truck drivers; in fact, as of 2001—almost 30 years after its enactment— the Prevailing Wage Act had "not been implemented for many truck drivers making

(Footnote continued on next page.)

13

III.

Having concluded that the meaning of "work under the contract" is ambiguous with respect to hauling activities that are not to, from, or on the project work site, "we apply canons of construction to determine the intent of the rule makers," *Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes*, 806 N.W.2d 17, 25 (Minn. 2011), including consideration of the "rulemaking record," *Citizens Advocating Responsible Dev. v. Kandiyohi Cty. Bd. of Comm'rs*, 713 N.W.2d 817, 828 (Minn. 2006). *See generally* Minn. Stat. § 645.16 (2014) (listing factors that may be considered "[w]hen the words of a law are not explicit"). In addition, we strictly construe "provisions that provide for a

_____

(Footnote continued from previous page.)

deliveries to state-funded projects because of disputes" about the prevailing wage requirements. Minn. Office of Admin. Hrgs., Proposed Amendments to Rules Governing Prevailing Wages: Trucking, Minnesota Rules, Chapter 5200, Report of the Administrative Law Judge, OAH 12-1900-13145-1, 2001 WL 702292, at *6, *11 (Jan. 30, 2001) (ALJ Report). Consequently, the definition and examples in Rule 5200.1106 were intended to clarify that deliveries to project sites constitute "work under a contract." *See infra* § III. It is not "that simple," as the dissent claims, to classify deliveries of asphalt cement from a commercial oil refinery to a contractor's facility. To begin with, these deliveries are not obvious "construction activities" under Minn. R. 5200.1106, subp. 2(A). *See* ALJ Report at *11 (stating that the delivery of "mineral aggregates to an asphalt or ready mix production facility" does not constitute a "construction activity"); *cf.* 26 C.F.R. § 1.199-3 (2015) (specifying that "[a]ctivities constituting construction" for purposes of determining domestic production gross receipts under the Internal Revenue Code generally "do not include tangential services such as . . . delivering materials, even if the tangential services are essential for construction"). Moreover, because the contractor's facilities serve the general public in addition to public works projects, it may not always be clear to aggregate suppliers or to the truckers which deliveries contain construction materials that will be used for state highway projects. For example, according to Wayne, the bills of lading for the deliveries of asphalt cement here were issued by the refinery, and Wayne did not know at the time that any of the deliveries were related to a state highway project.

penalty." *Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771, 774 (Minn. 2004); *see also*

*Chatfield v. Henderson*, 252 Minn. 404, 410, 90 N.W.2d 227, 232 (1958).[7]

In previous cases involving the interpretation of an ambiguous administrative rule, we have relied on statements of need and reasonableness (SONARs) "as evidence of the extrinsic factors listed in Minn. Stat. § 645.16." *Troyer*, 806 N.W.2d at 27; *see* Minn. Stat. § 14.131 (2014) (stating that "the agency must prepare . . . a statement of the need for and reasonableness of the rule," including "a description of the classes of persons who probably will be affected" and the "probable costs of complying with the proposed rule"). For example, in *Citizens Advocating*, we examined "the rulemaking record," including SONARs, "to determine what the rulemakers intended." 713 N.W.2d at 830. We proceed to do the same here.

Since the enactment of the Prevailing Wage Act in 1973, the Department of Labor and Industry (DLI) has worked with MnDOT, often "closely," in promulgating the administrative rules that interpret the Prevailing Wage Act. 1994 SONAR 2. Pursuant to

---

[7]     Generally, we defer to an agency's reasonable, longstanding interpretation of an ambiguous rule. *Annandale*, 731 N.W.2d at 513-14, 516. On the other hand, when an agency's interpretation of an ambiguous rule is recent or has not been consistent but is instead tantamount to a litigation position, deference is not appropriate. *Id.* at 521. We have explained that an agency's consistent and longstanding interpretation "may have encouraged reliance by the public" and may signal the delegating authority's view "either that the interpretation is correct or that the authority has willingly acquiesced to the agency's interpretation"; but, when the agency interpretation is more recent, "any reliance interest is diminished, and changed or new interpretations may be the product of political opportunism rather than good-faith efforts at interpretation." *Id.* at 528. Because the broad interpretation of "work under the contract" now advanced by MnDOT is not a longstanding interpretation of Minn. R. 5200.1106, the broad interpretation does not warrant deference. Indeed, MnDOT does not even argue that we must defer to its interpretation of the rule.

15

Minn. Stat. § 177.44, subd. 3, DLI has identified five general "classes of labor" for state highway projects that are subject to the prevailing wage requirements: laborers, power equipment operators, truck drivers, special equipment, and special crafts. Minn. R. 5200.1040. For each general class, the rules provide specific codes and classifications that contractors are required to use in "documenting classes of labor." Minn. R. 5200.1100, subp. 1(A); *see id.*, subp. 4 (addressing truck drivers). Significantly, in 1995, DLI described the subpart addressing truck drivers as identifying "the individual trucks which may be *used to haul material to, from, or about a construction project*." 1995 SONAR 23 (emphasis added). In other words, DLI did not consider hauling materials between two off-project sites, in preparation for construction, to be subject to the prevailing wage requirements. Rather, DLI expressed its understanding that only truck drivers hauling materials to, from, or about a construction project were performing work subject to the prevailing wage requirements.

In 2001, DLI promulgated Minn. R. 5200.1106 to further clarify the application of the prevailing wage requirements to truck drivers. 2000 SONAR 3, 8, 23-26, 33-34. According to DLI, the promulgation of Rule 5200.1106 was meant to ensure that the Prevailing Wage Act covered "labor costs associated with the hauling of asphalt, concrete, aggregate, and borrow to highway construction sites." 2000 SONAR 8. With respect to the hauling activities that are listed in Minn. R. 5200.1106, subp. 3(B), as examples of "work under the contract," DLI explained that the examples were "intended to ensure that drivers [were] paid prevailing wages *for hauling both to and from the construction site*." 2000 SONAR 35 (emphasis added). In particular, the example in

16

Minn. R. 5200.1106, subp. 3(B)(5), on which MnDOT now relies—"the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment"—was intended to clarify that the payment of prevailing wages for hauling materials to the project site was required, "even when [trucks hired by the contractor were] delivering from a commercial establishment." 2000 SONAR 36.[8] Thus, according to the 2000 SONAR, the language "on the site of or to or from a public works project," which is part of the definition of "work under the contract" in Minn. R. 5200.1106, subp. 2(A), was intended to apply to all six examples of hauling activities in Minn. R. 5200.1106, subp. 3(B), even example (5), which does not specifically reference the project work site.

In sum, the rulemaking history of Minn. R. 5200.1106 makes it clear that DLI considered only those truck drivers who are hauling materials "on the site of or to or from a public works project" to be engaging in "construction activities" that constitute "work under a contract" under the Prevailing Wage Act. Indeed, at oral argument, MnDOT admitted that it had never previously attempted to apply the Act to the types of hauling activities at issue here: deliveries of asphalt concrete from oil refineries to the facilities

---

[8]     This clarification was necessary, DLI believed, to distinguish these types of hauling activities from the hauling activities that fall within the scope of the commercial establishment exception. 2000 SONAR 36; *see* Minn. Stat. § 177.44, subd. 2 (providing that drivers hauling materials "*by or for commercial establishments*" fall within the scope of the commercial establishment exception (emphasis added)). DLI sought to clarify that drivers hauling materials *on behalf of the contractor*, albeit departing from a commercial establishment, are covered by the prevailing wage requirements, as made clear by the example in Minn. R. 5200.1106, subp. 3(B)(5). 2000 SONAR 36. Thus, the example in subpart 3(B)(5) was intended to distinguish hauling activities from a commercial establishment to the project site from exempt hauling activities.

17

of prime contractors. MnDOT submitted, however, that this was evidence not of its interpretation of the Act, but was merely a matter of "non-enforcement." But, as the Supreme Court has recognized, although agency enforcement power cannot simply "evaporate through lack of administrative exercise," it is also true that "the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Fed. Trade Comm'n v. Bunte Bros.*, *Inc.*, 312 U.S. 349, 351-52 (1941) (concluding that the Federal Trade Commission's 25-year-long failure to assert the power it was then claiming was a "powerful indication" of the scope of the act at issue). In even clearer terms, in *Bankamerica Corp. v. United States*, the Court underscored the significance of an agency's inconsistent enforcement history, noting that the Federal Trade Commission had "made no attempt" in 60 years to enforce an act with respect to activities it was claiming were covered, despite those activities being "widespread and a matter of public record throughout the period." 462 U.S. 122, 130 (1983). The Court found it "difficult to believe" that the FTC, the Department of Justice, and Congress all would have "overlooked or ignored the pervasive and open practice [at issue] had it been thought contrary to the law." *Id.* at 130-31. We likewise find it difficult to believe that DLI, MnDOT, and the Legislature all happened to overlook or ignore open and pervasive hauling activities—hauling activities that are customary in the construction industry—for more than two decades had they understood that those hauling activities required the payment of prevailing wages.

18

Interpreting "work under the contract" narrowly also is consistent with our rules of construction pertaining to the interpretation of statutes that impose penalties. *See, e.g.*, *Brekke*, 683 N.W.2d at 774. In light of the focus on "hauling activities on the site of or to or from a public works project" in Minn. R. 5200.1106, subp. 2(A), we decline to interpret "work under the contract" broadly to cover hauling activities that are not to, from, or on the project work site—activities MnDOT has never previously treated as construction activities subject to the Prevailing Wage Act. And although MnDOT cites the criminal penalty provision in Minn. Stat. § 177.44, subd. 6, as evidence of "the important purpose" the Act serves, "it is reasonable that a fair warning should be given" when a statute imposes criminal penalties, and "so far as possible the line should be clear." *McBoyle*, 283 U.S. at 27; *see also State v. Rick*, 835 N.W.2d 478, 486 (Minn. 2013) (articulating the rule that " 'no citizen should be held accountable for a violation of a statute whose commands are uncertain' " (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008))). In this case, the line between covered and non-covered hauling activities was not clear with respect to deliveries of construction materials that are not to or from a project work site.

In accordance with DLI's longstanding interpretation of the phrase "work under the contract," as expressed through the rulemaking history, as well as our rule of narrow construction that applies when a statute imposes penalties, we hold that Minn. R. 5200.1106 requires that hauling activities be to, from, or at the site of a public works project in order to constitute "work under a contract" within the meaning of the Prevailing Wage Act. Because the hauling activities of Donovan and Wayne were not to,

19

from, or on the project work sites, the hauling activities do not constitute "work under the contract" subject to the prevailing wage requirements. Therefore, we reverse the decision of the court of appeals, which affirmed summary judgment in favor of MnDOT.

Reversed.


HUDSON, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CHUTICH, J., took no part in the consideration or decision of this case.

LILLEHAUG, Justice (dissenting).

The requirements in the Minnesota Prevailing Wage Act (MPWA) for state highway projects are straightforward. So is the administrative rule that implements them. A laborer working for a contractor or subcontractor that has agreed "to do all or part of the work under a contract" is entitled to be paid at the prevailing wage rate. In these cases, prime contractors entered into contracts with the Minnesota Department of Transportation (MnDOT) to do state highway work. Each prime contractor entered into contracts with subcontractors to do some of the work. To do their work, the subcontractors employed laborers to haul asphalt cement. It follows that, under the MPWA, the laborers, who were performing "work under a contract," were entitled to be paid at the prevailing wage rate.

Rather than apply this logic, the court generates a fog of ambiguity. The purported ambiguity allows the court to carve out an exception to the MPWA: prevailing wages need not be paid for hauling activities that are not "to, from, or on the site" of the project. This judicially created exception violates the plain language of the statute and the implementing rule. Therefore, I respectfully dissent.

I.

The dispute in this case centers on the interpretation of Minn. Stat. § 177.44 (2014), which is part of the MPWA, Minn. Stat. §§ 177.41–.44 (2014). Section 177.44 covers wages and hours for work performed under state highway contracts. Interpreting a statute presents a question of law that we review de novo. *Gerber v. Gerber*, 714 N.W.2d

702, 704 (Minn. 2006). If the statute is unambiguous, we apply the statute's plain meaning. *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010).

The statute provides:

> A laborer or mechanic employed by a contractor, subcontractor, agent, or other person doing or contracting to do all or part of the work under a contract based on bids as provided in Minnesota Statutes 1971, section 161.32, to which the state is a party, for the construction or maintenance of a highway . . . must be paid at least the prevailing wage rate in the same or most similar trade or occupation in the area.

Minn. Stat. § 177.44, subd. 1. The words "work under a contract" are not unclear. At a minimum, they include the work performed on the state highway project by a prime contractor and by the prime contractor's subcontractors. The opinion of the court presents no argument to the contrary.

Applying the unambiguous statute to the facts in this case is not a difficult task. As the court describes, MnDOT contracted for two state highway projects with prime contractors SMC and Hardrives. SMC and Hardrives each subcontracted with Donovan to furnish and deliver asphalt cement for the projects. Hardrives also subcontracted with Wayne to deliver asphalt cement. Thus, Donovan and Wayne, both subcontractors, were "contracting to do . . . part of the work under a contract" with MnDOT. Their laborers, who were truck drivers, were entitled to be paid at the prevailing wage rate. It is just that simple.

II.

Instead of reading the statute as it is written, the court essentially amends it by misinterpreting the administrative rule that implements the statute, Minn. R. 5200.1106

D-2

(2015).  The court carves out an exception for hauling activities that are not "to, from, or on the site of" the highway project.  But there is absolutely nothing in the statute that even hints at such an exception.

The judicially created exception conflicts with our foundational rule of statutory interpretation that we do not, and cannot, add to a statute words intentionally or inadvertently omitted by the Legislature.  *See Rohmiller v. Hart*, 811 N.W.2d 585, 590 (Minn. 2012); *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001).  If a carve-out to the MPWA excluding its application to off-site hauling activities is desirable as a matter of policy, that job is for the Legislature.  *See Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 212 (Minn. 2014) ("[W]e must read this state's laws as they are, not as some argue they should be.")  The statute plainly covers the work of, and benefits the laborers of, subcontractors on state highway projects.

If the rule contained the exception the court carves out today, it would violate the statute.  Administrative agencies may adopt regulations to implement or make specific the language of a statute, but they may not adopt conflicting rules.  *See Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 781 (Minn. 2013); *Special Sch. Dist. No. 1 v. Dunham*, 498 N.W.2d 441, 445 (Minn. 1993) (stating that "[i]t is elemental that when an administrative rule conflicts with the plain meaning of a statute, the statute controls").  An administrative rule "cannot subvert the primary purpose behind the legislation," *Weber v. City of Inver Grove Heights*, 461 N.W.2d 918, 922 (Minn. 1990), which in the case of the MPWA includes extending the prevailing-wage requirement to all work performed under state highway contracts, *see* Minn. Stat. § 177.41 ("It is therefore the

policy of this state that wages of laborers, workers, and mechanics on projects financed in whole or part by state funds should be comparable to wages paid for similar work in the community as a whole."). The court's interpretation of the rule violates the statute.

Properly read, the rule is consistent with the statute. Each of the first three subparts of the rule shows that the hauling work covered by the statute and the rule need not be to, from, or at the site to trigger the requirement that the subcontractor pay its laborers at the prevailing wage rate.

Subpart 1 of the rule makes clear that, on state highway projects, "the prevailing wage rate . . . must be paid for work under the contract." Minn. R. 5200.1106, subp. 1. There is no exception for off-site hauling. Subpart 2(A) defines "work under the contract" broadly as "all construction activities associated with the public works project." *Id.*, subp. 2(A). And subpart 2(B) defines "contract" broadly as including "project proposals, plans, and specifications, and all requirements for labor, equipment, and materials found in such proposals, plans, and specifications." *Id.*, subp. 2(B). Again, there is no exception for off-site hauling; "all" means all.

Subpart 2(A) elaborates on the meaning of "under the contract": the phrase includes not only "any required hauling activities on the site or to or from a public works project" but also (using the word "and") "work conducted pursuant to a contract . . . regardless of whether the construction activity or work is performed by the prime contractor, subcontractor, trucking broker, trucking firms, independent contractor, or employee or agent of any of the foregoing entities, and regardless of which entity or person hires or contracts with another." *Id.*, subp. 2(A). The word "and" is one of

inclusion, not exclusion. *Lennartson v. Anoka–Hennepin Indep. Sch. Dist. No. 11*, 662 N.W.2d 125, 130 (Minn. 2003) (noting that the term "and" "is the type of language that is typically associated with a conjunctive rule").

Plainly, subparts 1, 2(A), and 2(B) of the rule apply to all activities under the contract. There is no exception in these subparts for off-site hauling.

Subpart 3(B) of the rule reinforces this reading. The subpart provides six examples of hauling activities "included in hours worked and considered work under the contract." Minn. R. 5200.1106, subp. 3(B). Examples (1) through (4) and example (6) reference hauling to, from, or at the construction site and thus do not apply here. But example (5) is exactly on point: "the delivery of materials or products by trucks hired by a contractor, subcontractor, or agent thereof, from a commercial establishment." *Id*., subp. 3(B)(5). Subcontractors Donovan and Wayne were delivering materials or products by trucks from commercial establishments—in this case, asphalt cement from refineries. Their hauling fits squarely within example (5). By reading example (5) out of the rule, the court ignores the Legislature's command that "[e]very law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2014).

To create ambiguity, the court points to the references in subparts 2(A) and 3(B) to hauling to, from, or on the construction site. But these references do not generate a reasonable alternative interpretation. All of the words on which the court relies are words of inclusion—on-site hauling work is "included and considered work under the contract"—and are not words excluding off-site hauling. Minn. R. 5200.1106, subp. 3(B). The court seems to be adopting a new principle of interpretation, which

D-5

could be phrased as: *inclusions* expressed shall be construed to *exclude all others*. This is a mutation of the doctrine of *expressio unius est exclusio alterius*, the canon of construction (to be applied only *after* ambiguity is found) that "[e]xceptions expressed in a law shall be construed to exclude all others," Minn. Stat. § 645.19 (2014). Indeed, the rule anticipates and answers the court's misunderstanding. Subpart 3 provides that the examples of "work under the contract" apply "[w]ithout limiting the application of [the rule] to other situations." Minn. R. 5200.1106, subp. 3. Plainly, the rule is not limited to hauling to, from, or on the site.

III.

Although not relevant to my plain-meaning textual analysis, I cannot help but observe that the court's new rule of law that off-site hauling is not "work under the contract" produces two ironies. First, it allows Donovan to escape the prevailing-wage requirement on the very same projects for which Donovan and its prime contractors received Disadvantaged Business Enterprise (DBE) credit for the same labor and material Donovan furnished—under the contract. *See* 49 C.F.R. § 26 (2015) (allowing contractors to receive credit for employing DBEs).

The second irony is that, had the subcontractors not been paid for their work, they could have made claim on, and been paid through, the prime contractors' payment bonds. Such bonds, generally required on state construction projects, are for the benefit of subcontractors "engaged under, or to perform the contract . . . ." Minn. Stat. § 574.26, subd. 2 (2014).

In other words, by the court's new rule of law, the subcontractors get the statutory benefits of working under a state contract, but the laborers performing the work for them do not. Such asymmetry is unwarranted.[1]

## IV.

Because I would affirm the court of appeals' decision that, in these cases, the subcontractor hauling services were "work under the contract," I would reach the second issue: whether the prime contractors were "commercial establishments" under the MPWA and the rule. They were not.

Although the MPWA does not contain an exception for all off-site hauling, it does expressly exempt one form of hauling. The prevailing wage rate need not be paid for "the delivery of materials or products *by or for* commercial establishments which have a fixed place of business from which they regularly supply the processed or manufactured materials or products." Minn. Stat. § 177.44, subd. 2 (emphasis added).

I agree with the district courts and with the court of appeals that, in this case, SMC and Hardrives were contractors, not "commercial establishments." In these cases, the commercial establishments were the refineries from which the subcontractors were delivering asphalt cement to the prime contractors. Donovan's and Wayne's deliveries were *from* the refineries, not *by or for* the refineries. Thus, the exception is inapplicable.

---

[1] Today's decision appears to be influenced by the fact that the executive branch has not consistently enforced the statute and the rule. But variations in executive enforcement policy from one administration to another do not and cannot alter our judicial function.

Accordingly, the court should have affirmed the court of appeals in all respects.

STRAS, Justice (dissenting).

I join in the dissent of Justice Lillehaug.